# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Craig Frerichs, DDS,                                   Civil No. 10-3340 (SRN/LIB)

                        Plaintiff,

                                                       <u>MEMORANDUM OPINION</u>
        v.                                             <u>AND ORDER</u>

Hartford Life and Accident Insurance
Company,

                        Defendant.
_____

Scott A. Johnson and Todd M. Johnson, Johnson Law Group, LLP, 10580 Wayzata Boulevard, Suite 250, Minnetonka, Minnesota 55305, for Plaintiff

Anna M. Horning Nygren and Eric C. Tostrud, Lockridge, Grindal, Nauen, PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Defendant
_____

SUSAN RICHARD NELSON, United States District Judge

        This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 47] and Plaintiff's Motion for Summary Judgment [Doc. No. 52].   For the reasons set forth herein, Defendant's motion is denied, and Plaintiff's motion is granted.

        Plaintiff Craig Frerichs graduated from the University of Minnesota Dental School in 1978 and began working in his field immediately thereafter.  (See Administrative Record ("AR")-HART000725.)   From 1999 through 2006, he was employed by PDG, PA/The Dental Specialists ("PDG" or "Park Dental Group").  (AR-HART000652.)   Frerichs was an eligible plan participant in his employer's benefit plan (the "Plan"), for which PDG obtained a group insurance policy (the "Policy") from Defendant Hartford Life and Accident Insurance Company ("Hartford").  (AR-HART000903-27.)   The Policy provided long-term disability coverage and

other benefits to eligible employees.  (Id.)

In July 2006, Dr. Frerichs filed a claim for long-term disability under the Policy, identifying spinal degeneration and depression as his disabling conditions.  (AR-HART000710.) Initially, Hartford approved Plaintiff's claim and paid benefits from May 2006 until April 2009. (AR-HART000023.)   However, after receiving an anonymous tip in 2008, Hartford investigated Plaintiff's claim and conducted surveillance of Dr. Frerichs.  (AR-HART000188.)  Following its investigation and review of Plaintiff's claim, Hartford terminated his long-term disability benefits in April 2009.  (HART000023-29.)  Dr. Frerichs appealed the termination decision. (AR-HART000275-96.)  Hartford briefly reinstated Frerichs' disability benefits from April to August 2009 while he recovered from rotator cuff surgery (AR-HART000002), but, in November 2009, affirmed its decision that Plaintiff's back pain and depression did not render him totally disabled from working as a dentist.  (AR-HART000002-12.)

Plaintiff filed the instant action on August 4, 2010, alleging that Hartford breached its contract by failing to provide long-term disability benefits, in violation of ERISA, 29 U.S.C. § 1132(A)(1)(b).  (Compl. [Doc. No. 1].)  The parties have filed cross motions for summary judgment.

## I.     BACKGROUND

### A.     The Policy

The Policy delegates to Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR-HART000922.)  The Policy defines an employee as "disabled" when he or she is "prevented from performing one or more of the Essential Duties of Your Occupation."  (AR-HART000918.)

An "essential duty" is one that: "(1) is substantial, not incidental; (2) is fundamental or inherent

to the occupation; and (3) can not be reasonably omitted or changed."  (Id.)  "Your Occupation"

means "your occupation as it is recognized in the general workplace.  Your Occupation does not

mean the specific job you are performing for a specific employer or at a specific location."  (AR-

HART000921.)

### B.   Medical Evidence 2005-2006

#### 1.   Back Pain

Beginning in approximately 1986, Dr. Frerichs experienced back strain and associated

pain.  (AR-HART000726.)  He found that chiropractic care and massage were helpful in

managing his back pain.  (Id.)  While at work at Park Dental on September 15, 2005, Plaintiff

reported that he was "bending over a patient and twisting" in order to obtain a better view, when

he experienced extreme pain in his back and legs.  (AR-HART000708.)  Dr. Frerichs contends

that the pain was so extreme that it took his breath away, sending him to the floor.  (AR-

HART000727.)  Dr. Frerichs met with his treating physican, Dr. Theodore Groskreutz, the

following day.  (AR-HART000680.)  Dr. Groskreutz noted Plaintiff's chronic lower back pain

had been present for at least a three year period and that an MRI showed degenerative disc

disease.  (Id.)  Dr. Groskreutz prescribed a steroid, a Medrol Dosepak, and ordered an MRI of

Frerichs' lumbar spine.  (Id.)  Dr. Frerichs was off work for approximately 43 days and returned

to full-time work on December 1, 2005.  (AR-HART000716-17.)

During his time off work in September 2005, Dr. Frerichs treated with orthopedic surgeon

Dr. Bryan Lynn at the Institute for Low Back and Neck Care in Minneapolis.  (AR-

HART000652.)  Dr. Lynn noted that Frerich's medical history was significant for lower back

pain and depression.  (Id.)  He reviewed Plaintiff's most recent MRI scans, which he found to demonstrate moderately advanced disc degeneration at L4-5, with noted reactive endplate changes.  (Id.)

Dr. Frerichs underwent left L5 nerve root block surgery on September 27, 2005, and reported a 60% decrease in pain symptoms following the procedure.  (AR-HART000654.)  At a follow-up visit with Dr. Lynn on October 10, 2005, however, he reported a return in pain symptoms.  (AR-HART000656.)

On October 20, 2005, Dr. Frerichs underwent a laminectomy of the L5-S1 level, performed by Dr. Lynn.  (AR-HART000660.)  At a follow-up appointment with Dr. Lynn on November 3, 2005, Dr. Frerichs reported feeling much better following the surgery.  (AR-HART000663.)  Dr. Lynn discussed Dr. Frerichs' possible return to work on a part-time basis: "I suggested he wear [a] brace to try and help with his twisting."  (Id.)  In a narrative attached to his 2006  application for long-term disability benefits, Dr. Frerichs stated that while the surgery alleviated much of his pain, "there was no way the surgeon could restore my abilities to what they once were."  (AR-HART000729.)  Plaintiff indicated that it became  "increasingly more evident that [his] back pain affect[ed] everything [he did] in the office."  (Id.)  Dr. Frerichs noted that he could not sit without pain and that he could not take narcotic pain medications because of their adverse effect on his concentration and thinking.  (Id.)  As a result, he became "very distraught and deeply depressed."  (Id.)  On February 25, 2006, he took an overdose of his wife's Ativan tablets in an attempt to commit suicide.  (Id.)  He was admitted to the hospital for severe depression.  (AR-HART000668.)

Also in February 2006, Dr. Frerichs met with Dr. Lynn, who reported that Frerichs had

4

been doing very well until recently, when he fell on the floor.  (Id.)  Dr. Lynn diagnosed "acute

exacerbation of low back pain."  (Id.)  Dr. Lynn recommended that Plaintiff continue taking

Ibuprofen and recommended that he consider the use of a muscle relaxant.  (Id.)

Dr. Frerichs continued treatment with Dr. Lynn, who recommended that Dr. Frerichs

undergo a Functional Capacities Evaluation ("FCE") to "quantify his physical limitations."  (AR-

HART000673.)  Dr. Lynn recommended the FCE in light of Plaintiff's multiple issues:

> The patient has multiple issues, he reports, related to concerns regarding his
> ability to continue work as a dentist.  In my experience, it would be
> extraordinarily unusual for someone to be completely disabled from work
> following a lumbar discectomy.  I believe a very large percentage of Mr. Frerichs'
> overall functional disability is related to his depression.  However, to quantify his
> physical limitations, I recommend that we obtain [an FCE].  I also advised him
> that it would be a good idea to quantify what physical activities are demanded of
> him in his typical work duties.  His lawyer will contact me by letter, if necessary,
> if other questions need to be answered.  I believe at some point in the future, a
> psychiatric evaluation will have to play a role in determining Mr. Frerichs' degree
> of disability.

(Id.)   At his next appointment with Dr. Lynn, on June 27, 2006, Dr. Lynn noted that Plaintiff

continued to report low back discomfort.  (AR-HART000674.)  At that visit, Dr. Frerichs

reported a shooting pain through his back that lasted for approximately five seconds, which he

had been experiencing for the previous three or four days.  (Id.)  Dr. Lynn recommended a

consultation with "a Med-X type of lumbar strengthening/stabilization program."  (Id.)  Dr. Lynn

later assessed Dr. Frerichs as "able to work with restrictions" from June 2, 2006 through August

2, 2006.  (AR-HART000675.)

## 2.   Depression

As noted, Dr. Frerichs has a history of depression, which he began experiencing in the

early 1990's, and for which he sought psychiatric care, including psychotropic medication and

counseling.  (AR-HART000412; HART000799.)  In 2005, Dr. Frerichs treated with Dr. John

Curran for his depression, for which he was prescribed medications including Wellbutrin,

Trazodone and Effexor.  (AR-HART000583; HART000799.)  As discussed previously, in

February 2006, Plaintiff attempted suicide by taking an overdose of Ativan medication, which

resulted in his hospitalization for eight days at Abbott Northwestern Hospital for major

depression and suicide attempt.  (AR-HART000800; HART000850.)  Following outpatient

treatment, he met with Dr. Curran again in April 2006 and revealed a previous suicide attempt in

December 2005.  (AR-HART000585.)

In the spring of 2006, Plaintiff began treating with psychiatrist Dr. Larry Berger, who

diagnosed major depression, recurrent, with moderate to severe intensity.  (AR-HART000786.)

As part of Plaintiff's application for long-term disability, in June 2006, Dr. Berger completed an

"Attending Physician's Statement of Disability," stating that Plaintiff was "not able to do clinical

dentistry."  (AR-HART000713.)

### C.     Claim for Long-Term Disability Benefits

On July 5, 2006, Plaintiff filed a claim for long-term disability benefits with Hartford.

(AR-HART000710.)   He indicated that he was unable to perform clinical dentistry, noting that

he was unable "to sit, stand, twist, bend over, walk or remain in a static position comfortably."

(AR-HART000708.)  In support of his application, Plaintiff submitted an "Attending Physician's

Statement of Disability" from Dr. Lynn, his orthopedic surgeon, and from Dr. Larry Berger, his

treating psychiatrist.  (AR-HART000712-15.)  Dr. Lynn indicated that Plaintiff's primary

diagnosis was "degeneration of lumbar or lumbosacral" spine, for which he should be restricted

to "light" duty work, which required changes to a sitting position every 30 minutes.  (Id.; AR-

HART000731.)  In addition, Dr. Lynn indicated that Plaintiff's "psychiatric impairment" showed "moderate impairment in occupational functioning.  Limited in performing most occupational duties."  (AR-HART000715.)  Dr. Berger indicated that Plaintiff's primary diagnosis was "major depression, recurrent, severe."  (AR-HART000712.)  Dr. Berger noted that Plaintiff was "not able to do clinical dentistry" and indicated that his psychiatric impairment was a "major impairment in several areas – work, family relations.  Avoidant behavior - is unable to work." (AR-HART000713.)

Plaintiff began treatment with Dr. Manuel Pinto of the Twin Cities Spine Center on August 10, 2006.  (AR-HART000608.)  Dr. Pinto assessed Plaintiff's persistent back and bilateral lower extremity pain, and also noted evidence of lumbar degenerative disease at L4-5 and L5-S1.  (Id.)  He recommended a new MRI to determine any level of persistent stenosis, stating, "His pain complaints, at his point in time, seem to be more with sitting, which implicates likely discogenic problems."  (Id.)  Plaintiff underwent the suggested MRI, which showed "severe concordant pain at L4-5 and L5-S1 with normal morphology and mild foraminal stenosis at L4-5 and L5-S1.  (AR-HART000760.)

To apparently supplement Plaintiff's long-term disability benefits application, Dr. Pinto provided an "Attending Physician's Statement of Continued Disability" form to Hartford.  In the form, dated October 31, 2006, he noted Plaintiff's discograms and MRI and diagnosed Plaintiff with degenerative disc disease at L4-5 and L5-S.  (AR-HART000747.)  As to Plaintiff's psychiatric impairment, Dr. Pinto checked the box indicating "major impairment in several areas – work, family relations. Avoidant behavior, neglects family, is unable to work."  (Id.)

A September 7, 2006 record indicates that Dr. Pinto discussed surgical outcomes, risks

7

and complications with Dr. Frerichs, who felt that he had "no other options" other than surgery. (AR-HART000762.)   The record also shows that Dr. Pinto completed a "Return to Work Form" indicating that Frerichs had been unable to work since February 25, 2006, and Dr. Pinto anticipated that he would be unable to work until recovery from his surgery, which would take approximately eight to twelve weeks.  (Id.)

On October 9, 2006, Hartford informed Dr. Frerichs that his claim for long-term disability benefits was approved.  (AR-HART000768.)  Hartford found that Plaintiff met the qualification requirements in October 2005, following his back procedure, but noted that benefits could not begin until May 26, 2006, because Plaintiff had attempted to return to work for a period in the winter of 2006.  (Id.)

### D.    Medical Evidence 2006-2007

#### 1.    Back Pain

On November 13, 2006, Plaintiff underwent surgery and, at a follow-up appointment on February 2, 2007, it was recommended that he remain off work for another three months, or through his next office visit with Dr. Pinto in May 2007.  (See AR-HART000500.)  At Plaintiff's May 15, 2007 visit with Dr. Pinto, it was noted that Plaintiff was doing well, although pain was still present.  (Id.)

On July 14, 2007, Hartford contacted Dr. Pinto, seeking his assessment of Plaintiff's ability to work, with or without limitations.  (Id.)  Hartford referenced the medical record of September 7, 2006, in which Dr. Pinto indicated that Plaintiff would be unable to work for eight to twelve weeks following surgery.  (Id.)

In his one-line response to Hartford of August 28, 2007, Dr. Pinto simply noted,

8

"recommend functional capacities assessment to establish restrictions."  (AR-HART000499.)

Apparently on his own behalf, Plaintiff arranged for an Occupational Therapy Evaluation

("OTE").  The OTE was conducted on October 9, 2007 by OTE evaluator Jessica Ogren of

NovaCare Rehabilitation.  (AR-HART00328-29.)  Ms. Ogren conducted testing in which Dr.

Frerichs simulated a dental procedure on a patient, requiring him to sit and fully flex his spine,

while rotating and laterally flexing to the right.  (AR-HART00329.)  "He was asked to simulate

this for 5 mins. as he would need to do for prolonged periods at work.  He was only in the

position for 26 seconds before feeling shooting pain in his low back and needing to sit up and

walk."  (Id.)  Ms. Ogren identified "position tolerance" as Plaintiff's major area of dysfunction

and made several recommendations, which include the following:

1.      It is recommended that Mr. Frerichs find work on a full-time basis within
        the abilities as stated on the enclosed task table and per Dr. Pinto's
        approval.  He is capable of lifting up to 35 lbs. occasionally and can
        complete trunk flexion activities in sitting and standing on an
        occasional/frequent basis.

2.      Mr. Frerichs would be unable to tolerate traditional dentistry at this time
        due to his inability to tolerate long durations of trunk flexion combined
        with lateral flexion/rotation as required when performing procedures on
        patients.  He would be capable of performing general dental exams and
        other basic dentistry tasks that do not require prolonged bending with
        twisting.  He could search for dentistry jobs that require exams and general
        preventive care only or perhaps work in more of an administrative
        position.

(Id.)  Dr. Frerichs forwarded a copy of the OTE to Dr. Pinto, along with "Capacities Evaluation"

forms, and asked that Dr. Pinto review the OTE, complete the forms and forward them to

Hartford.  (AR-HART000463.)

        Dr. Pinto completed the forms, indicating that Dr. Frerichs was off work until surgery on

November 9, 2007, and would need to remain off work for six to eight weeks post-surgery.  (AR-HART000471.)  Dr. Pinto noted that he would reassess Plaintiff's abilities and limitations at his re-evaluation appointment in December 2007.  In a November 6, 2007 "Physical Capacities Evaluation," Dr. Pinto noted that Plaintiff could sit for a maximum of one hour at a time, occasionally drive, occasionally reach above the shoulder, and never reach at the waist or below waist level.  (AR-HART000470.)  A March 12, 2008 note by Cate Pandiscio, Dr. Pinto's certified physician's assistant, writing on his behalf, indicated that the office had received and reviewed Ms. Ogren's OTE:

> We certainly read through the functional evaluation and agree that it is reasonable that Dr. Frerichs looks at some medium type work duties; obviously limiting his ability to perform general dentistry exams.  This is because of the positions that he needs to get into in order to do this.  This, however, does not preclude him from being gainfully employed in some other arena.

(AR-HART000409.)

### 2.    Depression

In February 2007, Dr. Berger, Plaintiff's psychiatrist, completed a "Psychiatric Attending Physicians' Statement of Disability" in which he diagnosed Plaintiff with major depression, panic disorder and bipolar disorder.  (AR-HART000737-38.)

### E.    Review and Investigation of Plaintiff's Award of Benefits

In June 2008, Hartford received an unsolicited, anonymous tip alleging that Plaintiff was involved in activities inconsistent with his claimed disabilities.  (AR-HART000178-79.)   The alleged activities included the development of a dentistry-related business venture in Mexico and Plaintiff's recertification in scuba diving.  (Id.)  Hartford decided to review Plaintiff's claim and hired a private investigator to conduct surveillance of Plaintiff.  (AR-HART000178;

HART001170-97.)  The investigator conducted video surveillance in July 2008 showing Dr.

Frerichs and his girlfriend driving from Minnesota to Kentucky in order to deliver a car to

Frerichs' son.  (AR-HART001175-1188.)  Over the course of two days, the video shows Dr.

Frerichs loading the car, driving for most of the trip, stopping for gas and food, and putting air in

the tires of the car.  (Id.)  Plaintiff drove for approximately nine hours on the first day of the trip

and nearly seven hours on the second day of the trip, spending additional time each day in the car

as a passenger.  (AR-HART001198; HART001202.)

   Hartford followed up by arranging an interview between Plaintiff and Hartford

investigator Stephen Murray, on October 8, 2008.  (AR-HART001199-1203.)  Dr. Frerichs

completed a written statement, indicating that his back pain significantly limited his physical

activity, that he had difficulty concentrating, and that persistent chronic pain in his lower back

prevented him from maintaining a static fixed position for longer than two minutes, all of which

prevented him from working as a dentist.  (AR-HART001157.)  He stated that he had trouble

closing the back of his sport utility vehicle because it hurt his lower back to do so, and that he

could drive for about two hours before needing to get out and stretch for about ten minutes. (AR-

HART001159; HART001161.)   While he indicated that he could typically drive for no more

than three hours a day, if he took pain medication and/or wore a brace, he could tolerate driving

for longer periods of time.  (Id.)  After reviewing the video surveillance, Dr. Frerichs stated that

it did not accurately reflect his level of functionality.  (AR-HART001199.)  He asserted that he

was able to drive for an extended period because he took extra pain medicine, was able to change

positions frequently and "sucked it up."  (AR-HART001161; HART001199-1200.)  In

submissions from Plaintiff and his girlfriend, he noted that the drive was necessary for several

reasons: (1) he and his son had no other reasonable way to exchange vehicles; (2) the drive did not require Dr. Frerichs to bend or flex, unsupported; and (3) the video did not capture the pain he suffered in the evening as a result of the drive.  (AR-HART001461-71.)

Hartford sent a copy of the video to three of Plaintiff's treating physicians – Dr. Spears, Dr. Trobiani and Dr. Berger.  (AR-HART000159; HART000149 (Trobiani); HART001447 (Spears); HART001455 (Berger).)  Dr. Trobiani refused to watch the video due to a disagreement with Hartford about his compensation for doing so, Dr. Spears did not watch it, indicating that he was not trained to conduct a functional assessment, and Dr. Berger noted that Plaintiff continued to report difficulty with memory, pain and cognitive issues.  (Id.)  Although it is unclear whether Hartford provided Dr. Pinto with a copy of the video, their records show that "Dr. Pinto stated that he had not seen the video."  (AR-HART000149.)

In January 2009, Hartford retained Susan McPherson, Ph.D., to conduct a medical examination and records review Independent Medical Examination ("IME").  Dr. McPherson found that Dr. Frerichs met the criteria for "Major Depressive Disorder Recurrent, in partial remission."  (AR-HART000351.)  Hartford asked McPherson whether Plaintiff could perform "in an occupational setting," to which she responded:

> As stated above, test results reveal the claimant is able to pay attention for sustained periods of time.  He is able to learn and retain new information which translates to an ability to learn new job tasks and remember to complete job duties he is asked to perform.

(AR-HART000353.)

In March 2009, Hartford obtained an independent medical record review by an orthopedic surgeon through MES Solutions, a medical consulting group.  (AR-HART001244-48; HART001358-90.)  Dr. David Bauer was the orthopedic surgeon who reviewed Dr. Frerichs'

12

medical records and the surveillance video and spoke to two of Plaintiff's treating physicians, Dr. Pinto and Dr. Spears.  (AR-HART001389; HART001247.)  Dr. Bauer opined that Dr. Frerichs was able to perform "full time work" at a medium level of functional capacity," or even general dentistry exams, but was unable to perform the tasks required for "traditional dentistry," stating:

> There is no reason to dispute the finding that "[Dr. Frerichs] would be unable to tolerate traditional dentistry secondary to his inability to tolerate long duration of trunk flexion combined with lateral flexion/rotation as required [for] performing procedures on patients.  He would be capable of performing general dentistry exams and other basic dentistry tasks that do not require prolonged bending with twisting."

(AR-HART000989) (quoting 10/9/07 OTE, AR-HART00329).

On April 7, 2009, Hartford terminated Plaintiff's long-term disability benefits, on both physical and psychological bases.  (AR-HART001231-37.)  In its letter, Hartford noted Dr. Bauer's assessment that Plaintiff was capable of performing the "Essential Duties" required of a dentist from a physical standpoint.  (AR-HART001236.)  "In addition, the independent neuropsychological examination revealed that you do not have restrictions or limitations from a cognitive standpoint."  (Id.)  The letter also noted that Hartford's Medical Case Manager found that Plaintiff appeared

> to have the ability of functioning at a light level, consistent with a 40 hour week. This would consist of standing, walking and/or sitting unlimited throughout the day, and allows for full use of the upper extremities, such as with frequent fingering, handling, reaching in all directions and typing.  Lifting/carrying would be limited to 10 pounds on a frequent basis, up to 20 pounds occasionally.  If sitting is primarily required throughout the day, afforded will be the opportunity [sic] to change positions as needed for comfort (by walking, standing or moving about).

(AR-HART001235.)

F.      Medical Evidence 2008-2009

1.      Back Pain

Throughout 2008 and 2009, Dr. Frerichs continued treatment and therapy for pain

symptoms.  (See AR-HART001253-57; HART001293-96; HART001281-84; HART001277-80;

HART001273-76.)   For example, he treated with internist Dr. Spears in the fall of 2008, for

back pain.  (See AR-HART001525-26.)  Dr. Spears prescribed Tramadol, a pain reliever.  (AR-

HART001529.)  Dr. Frerichs continued to report lower left back pain, which, on one occasion,

worsened when he attempted to assume a clinical dentistry position with bending, rotation and

twisting.  (Id.)

In February 2009, Dr. Frerichs was involved in a rear-end collision, after which he

reported a worsening in back pain.  (AR-HART001289-92.)  He visited Dr. Pinto within a few

days of the collision, complaining of residual low back pain.  (AR-HART001324.)  Dr. Pinto

ordered an MRI of the lumbar spine, conducted on March 4, 2009.  Dr. Frerichs reviewed the

results of the MRI with Dr. Pinto on March 10, 2009.  Dr. Pinto found that the spinal

degeneration had migrated above the spinal fusions, with disc degeneration at L3-4, with

herniations, some facet arthritis and some left L3-4 foraminal stenosis.  (AR-HART001325.)  Dr.

Pinto noted:

> Certainly the findings explain the patient's symptoms.  If his pain eventually gets
> so severe that he would consider surgical treatment, then discograms would be
> done.  If discograms confirmed the presence of symptomatic lumbar disc disease
> at L3-4, then he would be a candidate for an XLIF at L3-4; just a minimally
> invasive procedure.

(Id.)

Plaintiff was approved for Social Security Disability Benefits on March 11, 2009.  (AR-

14

HART000376-78.)    While the Agency initially denied benefits, they were awarded by

Administrative Law Judge ("ALJ") Larry Meuwissen based on the written record.  (AR-

HART000381-85.)   The ALJ found that Plaintiff had the following severe impairments: major

depression, degenerative disk disease and spinal stenosis.  (AR-HART000383.)  He found that

Dr. Frerichs was unable to perform his past relevant work as a dentist, that his acquired job skills

did not transfer to other occupations within his residual functional capacity and that there were

no jobs existing in significant numbers in the national economy that Frerichs could perform.

(AR-HART000385.)

In 2009, Plaintiff had developed shoulder pain, resulting in rotator cuff surgery in April

2009.  (AR-HART001061-65; HART000370-74; HART001070-01.)  Later in April, Dr. Pinto

evaluated the recently ordered discograms.  (AR-HART000365-66.)  The reviewing physician,

Dr. Blake Johnson, reported that the discogram process, at L3-4, produced "severe (8/10)

concordant low back pain and left leg pain."  (AR-HART000365.)  The discograms showed "disc

morphology is abnormal with circumferential outer annular fissuring . . . in contrast to the

preoperative Discogram dated 8/22/06 which showed normal disc morphology."  (Id.)  Dr.

Johnson also noted that Plaintiff demonstrated normal pain tolerance and that his responses to

injections were "judged to be valid."  (Id.)

In his review of the discograms with Dr. Frerichs, Dr. Pinto concluded that

[t]he discograms certainly were valid. . . .  L3-4 was torn and gave him 8/10
concordant back pain with left leg pain.  We know that he has developed some
mild stenosis at L3-4.  He certainly has pathology that justifies the presence of the
low back pain.  Difficulty sitting is a very common complaint with patients with
symptomatic lumbar disc derangement like Mr. Frerichs.

(AR-HART000367.)  Dr. Pinto also advised Plaintiff to undergo a full FCE so that Dr. Pinto

would be better able to establish Frerichs' work restrictions. (Id.)

In May 2009, Dr. Frerichs consulted with Dr. John Sherman of Orthopedic Consultants. Dr. Sherman conducted a physical and reviewed Plaintiff's most recent MRI. (AR-HART000368-9; HART001034.) He noted that Dr. Frerichs was experiencing 90% back pain and 10% leg pain. He concluded that "Mr. Frerichs' symptoms are consistent with chronic pain syndrome." (Id. at HART000369.) He advised against surgery but recommended evaluation for pain control at a nonpharmacologic pain clinic. (Id.)

On August 4, 2009, Dr. Frerichs apparently arranged for an FCE with Jessica Ogren on his own volition "to determine his abilities to tolerate work in his career of Dentistry." (AR-HART001034.) Ogren had previously conducted the OTE of Plaintiff in October 2007. Ms. Ogren observed Plaintiff perform a variety of tasks including pushing, pulling, sitting, working bent over while sitting, and forward reaching. (AR-HART001036.) She identified "position tolerance" as the major area of dysfunction and noted that "[d]ecreased muscle strength in the low back" and "[p]ain in the low back" were the factors underlying Plaintiff's performance. (AR-HART001037.) As requested by Ogren, Plaintiff contacted the office the day following the testing and reported significant levels of low back pain (8.5 on a scale of 1-10), stiffness and difficulty bending. (Id.) Ms. Ogren made the following recommendations in the FCE:

> 1. Mr. Frerichs would be unable to tolerate traditional dentistry at this time due to his inability to tolerate long durations of trunk flexion combined with lateral flexion/rotation as required when performing procedures on patients. In addition, he cannot tolerate sitting more than frequently and the demands of dentistry require constant sitting. He would be capable of performing general dental exams and other basic dentistry tasks that do not require prolonged bending with twisting (no procedures). Though finding/securing a job at this capacity would be very difficult given the length of time he has been out of his field.

16

2.      It is recommended that Mr. Frerichs find work on a full-time basis within
the abilities as stated on the enclosed task table and per his physician's
approval.  He is capable of lifting up to 20 lbs. occasionally and can
complete trunk flexion activities in sitting and standing on an occasional
basis.

(Id.)

Plaintiff treated with Dr. Pinto the following month, on September 22, 2009.  (CF001555,

Ex. A to Aff. of Todd Johnson.)[1]  Dr. Pinto noted Plaintiff's recent FCE, stating, "He came in

today with an FCE which shows that indeed he has some significant restrictions that interferes

[sic] with his ability to work at his regular job as a dentist (operate dentistry).  The FCE also

clearly states he is able to work with modified restrictions."  (Id.)  Dr. Pinto completed a "Return

to Work" form that day, indicating that "Mr. Frerichs may return to work as light duty, only,

following the restrictions outlined in his FCE 08/04/09.  Non operative dentistry.  Short duration

procedures only."  (CF001556, Ex. A to Johnson Aff.)

        **2.      Depression**

In April 2008, Dr. Berger completed another "Attending Physician's Statement," noting,

"I don't think [Dr. Frerichs] is able to be employed" (AR-HART000391), and "[h]e can't work

as a dentist because of his back limitations." (AR-HART000390; HART000410-17.)

In December 2008, Dr. Berger recommended a follow-up assessment with

neuropsychologist Dr. Thomas Misukanis to evaluate Plaintiff's cognitive and psychological

---

[1]  This record is one of two pages of medical records from Dr. Pinto dated September 22,
2009.  (CF001555-56, Ex. A to Johnson Aff.)  They were apparently excluded from the
Administrative Record produced in this litigation.   It appears that these records "were among
medical records produced by Hartford to Dr. Frerichs' [counsel ] in December 2009, shortly after
Hartford denied Frerichs' appeal, although missing from the Administrative Record in this
litigation."  (Pl's Mem. Supp. Mot. Summ. J. at 42-43 [Doc. No. 53].)

functioning.  (See AR-HART000334-35.)   Dr. Misukanis noted that since Plaintiff's initial

assessment, Dr. Berger had revised his diagnosis away from bipolar disorder and had suggested

the follow-up evaluation "to evaluate for potential improvement in Dr. Frerichs' cognitive and

psychological functioning."  (AR-HART000334.)  Dr. Misukanis administered a variety of tests

and found "mild improvement in Dr. Frerichs' mentation and psychological functioning."  (AR-

HART000335.) Elaborating on his conclusions, Dr. Misukanis stated:

> These improvements are certainly cause for encouragement.  At the same time, he
> continues to demonstrate minor cognitive difficulties and a significant
> psychological disturbance which, in my opinion, would preclude a return to work
> as a dentist anytime in the near future.  The patient may be capable of employment
> in other types of work, though this would largely be contingent on his
> psychological status.

(Id.)

### G.      Appeal of Termination of Benefits

Dr. Frerichs timely appealed the termination of benefits.  In connection with his appeal,

he provided to Hartford, among other things, copies of updated medical records, the favorable

Social Security ruling, and a neuropsychological re-evaluation report from Dr. Misukanis.  (AR-

HRT000006-7.)

Hartford retained the Medical Consultants Network to provide a physician to conduct an

IME.  Orthopedist Dr. Stephen Barron examined Plaintiff on August 17, 2009, as part of the IME

and provided a report.  (AR-HART001045-54.)   In his report, Dr. Barron listed the various

medical records that he had reviewed in connection with reaching his opinion, but did not list the

August 4, 2009 FCE conducted by Jessica Ogren.  (Id.)  Dr. Barron also did not review Dr.

Pinto's September 22, 2009 records, as Dr. Barron's IME preceded Plaintiff's September

appointments with Dr. Pinto.  Dr. Barron found that Plaintiff needed permanent restrictions,

stating:

> In my opinion, based upon his operative procedures, my review of the medical records, his physical examination, and his surveillance video, <u>he does need permanent restrictions</u>.  In my opinion, he should not lift over 50 pounds, he should not do repetitive bending from the waist.

(AR-HART001053) (emphasis added).  However, Dr. Barron then opined:

> Based upon the fact that he has no objective findings on his lumbar spine examination and the way in which he behaved during the two day surveillance, in my opinion he is capable of working in the necessary dental operative position <u>without any limitations or restrictions</u>.  In my opinion, I believe that he is able to bend, rotate, and sustain the body in the necessary dental operative positions based upon his lack of objective findings on his physical examination as well as his behavior during the two day surveillance video.

(AR-HART001053-54) (emphasis added).

Defendant also hired University Disability Consortium ("UDC") to conduct an IME.  Dr. Milton Jay, a consulting neuropsychologist, conducted a records review but did not directly examine Dr. Frerichs.  (AR-HART001109.)   Although Dr. Jay attempted to contact Dr. Berger, he was unable to reach him.  (AR-HART001109-10.)   In the report of his record review, Dr. Jay discussed Dr. Misukanis' 2009 neuropsychological re-examination (AR-HART001113) and Dr. McPherson's 2009 neuropsychological IME.  (AR-HART001111-12.)   He took issue with Dr. Misukanis' methodology, which he believed undermined the accuracy of Dr. Misukanis' 2009 test results.  (AR-HART001113-14.)   Dr. Jay concluded that there was not "adequate evidence that [Dr. Frerichs] had mood disorder or personality dysfunction of a severity and scope sufficient to remove and preclude the option of returning to any gainful employment."  (AR-HART001115.)  Similarly, Dr. Jay found that while Plaintiff had complaints of depression, the "depressive severity appeared to be mild and not sufficiently severe to threaten any gainful employment."  (<u>Id.</u>)

19

Hartford issued a denial of Dr. Frerichs' appeal on November 9, 2009.  (AR-HART000002-12.)  In reaching its conclusion, Hartford stated that "the medical data and lack of objective findings fails [sic] to substantiate the severity of your claimed symptoms and restrictions which seem mostly, if not entirely, based on your self-report which given the totality of the evidence does not appear completely accurate."  (AR-HART000010.)  Hartford further noted that the opinions of several doctors concerning Plaintiff's capability of performing operative dentistry contradicted Ms. Ogren's opinion:

> While Ms. Ogren maintains her opinion that you would be incapable of performing dental operative procedures due to your back pain complaints, multiple physicians, including Dr. Pinto, Dr. Bauer and Dr. Barron have concluded you would be capable of performing the duties of your occupation as a Dentist.

(Id.)

In its denial of Plaintiff's appeal, Hartford also discounted Plaintiff's claimed cognitive and/or psychological impairment, pointing to Dr. Frerichs' lengthy appeal letter: "Your assertion appears to be that you have a cognitive and/or psychological impairment which affects your ability to concentrate or sustain employment, yet you drafted a 22-page letter of appeal complete with footnotes, references and a bibliography that categorically addresses every aspect of the rationale used to terminate your claim."  (AR-HART000007.)  Hartford also discounted Dr. Berger's opinions: ". . . [I]t appears that [Dr. Berger] is simply stating your symptoms as you have reported to him as opposed to relying on any specific medical testing or examination findings which, upon review of the majority of the medical records and reports contained in the claim file, has typically been the case with respect to your symptoms."  (Id.)  Hartford also relied heavily on Dr. Jay's opinion that both Dr. Misukanis and Dr. McPherson "utilized the MMPI-2

and noted extremely high symptom reporting that raised some threat to validity and required

significant caution in interpretation because [Dr. Frerichs'] symptom over-reporting seemed

rather clear." (AR-HART000008.)

Having issued the denial of Dr. Frerichs' appeal, Hartford advised him that he could bring

a civil action under section 502(a) of ERISA in order to review the decision.  (AR-

HART000011.)   As noted previously, Plaintiff filed the instant action on August 4, 2010.

## H.    Essential Duties of a Dentist

As noted previously, the Policy defines an employee as "disabled" when he or she is

"prevented from performing one or more of the Essential Duties of Your Occupation."  (AR-

HART000918.)  An "essential duty" is one that: "(1) is substantial, not incidental; (2) is

fundamental or inherent to the occupation; and (3) can not [sic] be reasonably omitted or

changed."  (Id.) "Your Occupation" means "your occupation as it is recognized in the general

workplace.  Your Occupation does not mean the specific job you are performing for a specific

employer or at a specific location."  (AR-HART000921.)

To determine the "essential duties of a dentist" in his application for long-term disability

benefits, Plaintiff's employer, Park Dental Chaska, completed a section of the application form

describing the physical aspects of Plaintiff's job.  (AR-HART000707.)  Park Dental reported that

Plaintiff's activities included "pushing" in the form of packing filling material/removing teeth,

using other instruments; "pulling" in the form of removing teeth and filling material from teeth;

"lifting" dental equipment, supplies, instruments and patients; and "carrying" patient dental

records and supplies.  (Id. ) In addition, Park Dental indicated that the job could not be performed

by alternating sitting and standing, nor could the job be modified to accommodate the disability

either temporarily or permanently.   (Id.)

In his April 2009 appeal of Hartford's termination of his benefits, Plaintiff submitted a document entitled "Dictionary of Occupational Titles and Jobs" ("DOT"), from the Occupational Information Network ("O*Net"),[2] which sets forth the abilities and work activities required in a given field.  (AR-HART000274; HART000298-311.)  Among the "abilities" required of a dentist as highlighted by Plaintiff, are:

> Extent Flexibility:  The ability to bend, stretch, twist, or reach out with the body, arms and/or legs.
>
> Trunk Strength: The ability to use one's abdominal and lower back muscles to support part of the body repeatedly or continuously over time without "giving out" or fatiguing.
>
> Static Strength: The ability to exert maximum muscle force to lift, push, pull, or carry objects.
>
> Dynamic Flexibility: The ability to quickly and repeatedly bend, stretch, twist, or reach out with the body, arms and/or legs.

(AR-HART000302-04.)  The DOT also defines "work activities" of dentists to include the following:

> Making Decisions and Solving Problems: Combining, evaluating, and reasoning with information and data to make decisions and solve problems.  The processes involve making decisions about the relative importance of information and choosing the best solution.

(AR-HART000304.)   Plaintiff also submitted the DOT applicable to surgeons, which lists the

---

[2] O*Net is "a database of occupational requirements and worker attributes. It describes occupations in terms of the skills and knowledge required, how the work is performed, and typical work settings."   U.S. Dep't of Labor, http:// www. doleta. gov/ programs/ onet/ (last visited June 13, 2012).

following "abilities," among others, required of a surgeon:

> Arm Hand Steadiness: The ability to keep the hand and arm steady while making an arm movement or while holding the arm and hand in one position.

> Trunk Strength: The ability to use one's abdominal and lower back muscles to support part of the body repeatedly and continuously over time without "giving out" or fatiguing."

> Dynamic Strength: The ability to exert muscle force repeatedly or continuously over time.  This involves muscular endurance and resistance to muscle fatigue.

> Extent Flexibility: The ability to bend, stretch, twist, or reach out with the body, arms and/or legs.

> Dynamic Flexibility: The ability to quickly and repeatedly bend, stretch, twist or reach out with the body, arms and/or legs.

(AR-HART000316-18.)

In considering Plaintiff's appeal of the termination of benefits, on October 6, 2009, Hartford contacted Rehabilitation and Re-Employment, Inc. to conduct a labor market survey to "obtain information concerning the physical demands of the occupation of a Dentist in the Minneapolis-St. Paul, MN geographical area."  (AR-HART001018.)  The research entity, which was charged with the task of contacting ten dentists in the Twin Cities, contacted three dentists in the Twin Cities and researched the American Dental Association along with "various informational websites such as Yahoo and Wikipedia."  (Id.).  The researchers sought to determine the percentage of time a dentist performs operative procedures, the types and average length of each exam, and how a dentist's day is scheduled in regards to appointments.  (Id.)  The results of the survey showed that dentists typically spend 75% of their time performing restorative procedures such as examinations of the teeth and gums, root canals, cavity fillings, tooth shaping for crowns, crown fitting and placement, bridge and denture assessment and

follow-up exams.  (AR-HART001019.)  No procedure took longer than an hour to perform.  (Id.)

## II.   DISCUSSION

### A.   Standard for Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Whisenhunt v. S.W. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986);  Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Davenport v. Univ. of Ark. Bd. of Trustees, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### B.   Standard of Review for Claims Under §§ 502(a)(1)(B) and 502(a)(3)

ERISA § 502(a)(1)(B) provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  An administrator's denial of benefits under an ERISA plan is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire

& Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  When a policy provides the plan

administrator with discretionary authority to determine eligibility for benefits, as is the case here,

an abuse of discretion standard generally applies.  Id.[3]

Dr. Frerichs argues that this Court should apply a less deferential "sliding scale" standard

of review when evaluating the plan administrator's decision, relying on Payzant v. UNUM Life

Ins. Co. of Am., 402 F. Supp.2d 1053, 1060 (D. Minn. 2005) (applying the test in Woo v. Deluxe

Corp., 144 F.3d 1157, 1162 (8th Cir. 1998), abrogated on other grounds by Metro. Life Ins. Co.

v. Glenn, 554 U.S. 105 (2008)).  Hartford, however, argues that a deferential abuse of discretion

standard of review applies.   Under Woo, to obtain a less deferential standard, a plaintiff is

required to "present material, probative evidence demonstrating that (1) a palpable conflict of

interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan

administrator's fiduciary duty to [him]."  Woo, 144 F.3d at 1160.   Plaintiff argues that Hartford's

decision upholding the termination his disability benefits was founded "upon a compendium of

procedural irregularities reflecting such a conflict of interest. . . ."  (Pl's Mem. Supp. Mot.

Summ. J. at 34.)

Following the Supreme Court's Glenn decision, case law on the applicable standard of

review in ERISA actions in this Circuit is still evolving.  Post-Glenn, a conflict of interest no

longer triggers application of the sliding-scale approach, but instead "is simply one of several

factors considered under the abuse of discretion standard." Wrenn v. Principal Life Ins. Co., 636

F.3d 921, 924, n. 6 (8th Cir. 2011).  In Wrenn, the Eighth Circuit noted the extent to which

---

[3] Here, the employee benefit plan "grant[s] [Hartford] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR-HART000925.)

Glenn changed the standard of review as it relates to conflicts of interest, but the Eighth Circuit

did not rule on whether the existence of a serious procedural irregularity likewise altered the

standard of review:

> After the Supreme Court's decision in Glenn, the Woo sliding-scale approach is
> no longer triggered by a conflict of interest, because the Supreme Court clarified
> that a conflict is simply one of several factors considered under the abuse of
> discretion standard. The procedural irregularity component of the Woo sliding
> scale approach may, however, still apply in our circuit post-Glenn. See Wakkinen
> v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 582 (8th Cir. 2008) (stating "[w]e
> continue to examine [a procedural irregularity] claim under Woo"); but see
> Chronister v. Unum Life Ins. Co. of Am., 563 F.3d 773, 776 (8th Cir. 2009)
> (analyzing a procedural irregularity, i.e., a plan administrator's failure to follow its
> own claims-handling procedures, as one factor under Glenn's abuse of discretion
> standard).

Id.  Because the court concluded that the plan administrator in Wrenn had abused its discretion, it

did not address the extent to which Glenn may have changed the procedural irregularity

component of Woo's sliding-scale approach.  As in Wrenn, this Court finds it unnecessary to

resolve this issue because even under the abuse of discretion standard, the Court concludes that

Plaintiff is entitled to summary judgment.

## C.    Reasonableness

Under an abuse of discretion standard, the reviewing court "will uphold the

[administrator's] decision to deny benefits if it is reasonable." Maune v. Int'l Bhd. of Elec.

Workers, Local No. 1 Health & Welfare Fund, 83 F.3d 959, 962–63 (8th Cir. 1996).  "We

measure reasonableness by whether substantial evidence exists to support the decision, meaning

'more than a scintilla, but less than a preponderance.' "  Wakkinen v. UNUM Life Ins. Co. of

Am., 531 F.3d 575, 583 (8th Cir. 2008) (quoting Woo, 144 F.3d at 1162).  It is well settled in

ERISA cases that a reviewing court may not "substitute [its] own weighing of the evidence for

26

that of the administrator," <u>Ferrari v. Teachers Ins. & Annuity Ass'n</u>, 278 F.3d 801, 807 (8th Cir.

2002), and a court "will not disturb a decision supported by a reasonable explanation even

though a different reasonable interpretation could have been made." <u>Clapp v. Citibank</u>, 262 F.3d

820, 828 (8th Cir. 2001).  Courts, however, must evaluate "the quantity and the quality of the

evidence." <u>Id.</u>, (internal citation omitted).

 In order to terminate Plaintiff's disability benefits, Hartford had to determine that Plaintiff

was no longer "disabled" as defined by the Policy.  As noted, the question is not whether Plaintiff

is able to resume his former occupation or perform some of his former duties.  The question is

whether he is "prevented from performing one or more of the Essential Duties of [his]

Occupation," as that occupation is recognized in the general workplace. (AR-HART000918;

HART000920.)

 Defendant argues that it acted reasonably in terminating Plaintiff's disability benefits

because substantial evidence establishes that Plaintiff is capable of performing the essential

duties of dentistry.  Specifically, Hartford points to the following in support of its argument: (1)

substantial evidence supports Hartford's interpretation of the essential duties of dentistry; (2)

Hartford was justified in crediting the opinions of its physicians; (3) the surveillance video

provides substantial evidence of Plaintiff's level of functionality; (4) Hartford is not bound by the

conclusions of the Social Security Administration; and (5) changed circumstances justified

Hartford's decision to terminate Plaintiff's benefits.   (Def's Opp'n Mem. at i-ii [Doc. No. 60].)

  **1. Physicians' Opinions**

   **a. Misstatements as to Physicians' Opinions**

As to Hartford's contention that it was justified in crediting the opinions of its physicians,

the Court disagrees.   Hartford misstated the opinions of Plaintiff's treating physicians in its

November 9, 2009 letter denying Plaintiff's appeal.  In the denial of appeal letter, Hartford states,

"While Ms. Ogren maintains her opinion that you would be incapable of performing dental

operative procedures due to your back pain complaints, multiple physicians, including Dr. Pinto,

Dr. Bauer and Dr. Barron have concluded you would be capable of performing the duties of your

occupation as a Dentist."  (AR-HART000010.)  As discussed below with respect to these

physicians, this is a fundamental factual misstatement upon which Hartford based its decision.

Similarly, in its denial of appeal letter, Hartford identifies Dr. Misukanis, Plaintiff's

neuropsychologist, as failing to "find any indication of significant cognitive impairment," noting

"significant exaggeration of symptoms relating to your psychological reports." (Id.)   The record

indicates otherwise, as the Court addresses below.

### i.    Dr. Pinto

In August 2007, Dr. Pinto recommended that Dr. Frerichs undergo a functional capacities

assessment to establish his restrictions.  (AR-HART000499.)  On his own behalf, Dr. Frerichs

arranged for an OTE with Jessica Ogren in October 2007.  (AR-HART00328-29.)  During the

evaluation, Dr. Frerichs simulated a dental procedure on a patient, requiring him to sit and fully

flex his spine, while rotating and laterally flexing to the right.  (AR-HART00329.)   Based on Dr.

Frerichs' "position tolerance" difficulties, she recommended that he find work on a full-time

basis within his abilities, however, Ogren concluded that he was "unable to tolerate traditional

dentistry at this time due to his inability to tolerate long durations of trunk flexion combined with

lateral flexion/rotation as required when performing procedures on patients." (Id.)  Ms. Ogren

suggested that Dr. Frerichs could search for dentistry jobs that only require exams and general

preventive care only, or work in an administrative position.  (Id.)

Dr. Pinto reviewed the October 2007 OTE (see AR-HART000463), and, on his behalf, his physician's assistant indicated in March 2008 that the functional evaluation was "reasonable," further noting, "obviously limiting his ability to perform general dentistry exams," although not precluding Dr. Frerichs "from being gainfully employed in some other arena."  (AR-HART000409.)   In March 2009, Dr. Pinto reviewed the results of a recent MRI, finding that Plaintiff's spinal degeneration had migrated, with disc degeneration, herniations, some facet arthritis and some foraminal stenosis.  (AR-HART001325.)  He noted, "Certainly the findings explain the patient's symptoms."  (Id.)  In April 2009, Dr. Pinto reviewed Plaintiff's most recent discograms, finding that they were "valid," and that "[Dr. Frerichs] certainly has pathology that justifies the presence of the low back pain. Difficulty sitting is a very common complaint with patients with symptomatic lumbar disc derangement like Dr. Frerichs."  (AR-HART000367.)

Upon Dr. Pinto's recommendation, Plaintiff underwent an FCE with Ms. Ogren in August 2009 to determine his ability to work in dentistry.  (AR-HART001034.)  Ms. Ogren found that "Mr. Frerichs would be unable to tolerate traditional dentistry at this time due to his inability to tolerate long durations of trunk flexion combined with lateral flexion/rotation as required when performing procedures on patients."  (Id.)  She specifically found that Dr. Frerichs could not tolerate sitting "more than frequently and the demands of dentistry require constant sitting.  He would be capable of performing general dental exams and other basic dentistry tasks that do not require prolonged bending with twisting (no procedures)."  (Id.)   Ms. Ogren recommended that Dr. Frerichs find work within his abilities, per his physician's approval.  (Id.)

On September 22, 2009, Dr. Pinto reviewed Plaintiff's August FCE, agreeing that it

showed significant restrictions that interfered with Dr. Frerichs' "ability to work at his regular job as a dentist (operative dentistry)." (CF001555, Ex. A to Johnson Aff.) He also acknowledged that the FCE indicated that Plaintiff was able to work with modified restrictions. (Id.) Dr. Pinto therefore completed a "Return to Work" form, indicating that Plaintiff could return to work as light duty only, "following the restrictions outlined in his FCE 08/04/09. Non operative dentistry. Short duration procedures only." (CF001556, Ex. A to Johnson Aff.)

While Dr. Pinto indicates that Plaintiff may be capable of performing some limited, short procedures, he does not state, as Hartford contends, that Plaintiff is "capable of performing the duties of [his] occupation as a Dentist." (AR-HART000010.) Instead, the record quoted above demonstrates that Dr. Pinto found that Plaintiff's ability to work as a dentist was limited to non-operative, short duration procedures.

In addition, in its April 7, 2009 letter terminating Plaintiff's benefits, Hartford describes a conversation between its IME record reviewer, Dr. Bauer, and Dr. Pinto. (AR-HART001236.) The paragraph addressing their discussion concludes, "Dr. Pinto did not have any clinical data to support your impairments." (Id.) Whether the quote is accurate or not, it is belied by the record. While Dr. Pinto noted Plaintiff's improvement at times, his records also attest to the validity of Plaintiff's complaints, as borne out by the fact of multiple back surgeries and the results of his discograms and MRIs.

### ii.    Dr. Bauer

Again, Hartford contended in its November 9, 2009 denial of appeal letter that " multiple physicians, including Dr. Pinto, Dr. Bauer and Dr. Barron have concluded [Plaintiff] would be capable of performing the duties of [his] occupation as a Dentist." (AR-HART000010.)

However, Hartford's IME record review physician, Dr. David Bauer, an orthopedic surgeon, did not reach such a clear-cut conclusion in his March 2009 report.  While Dr. Bauer concluded that Plaintiff was able to work with certain restrictions, he adopted Ms. Ogren's October 2007 OTE conclusions, as well as Dr. Pinto's endorsement of the OTE conclusions, stating that "[t]here is no reason to dispute the finding that '[Dr. Frerichs] would be unable to tolerate traditional dentistry. . . . He would be capable of performing general dentistry exams and other basic dentistry tasks that do not require prolonged bending with twisting."  (AR-HART000989) (quoting 10/09/07 OTE, AR-HART00329) (emphasis added).

In its April 7, 2009 letter terminating Plaintiff's benefits, Hartford also cited to Dr. Bauer's conclusions, stating that Dr. Bauer found that Plaintiff was capable of performing the "Essential Duties of a Dentist."  (AR-HART001236.)  As noted above, Dr. Bauer adopted Ms. Ogren's opinion that Dr. Frerichs was capable of performing dentistry tasks that do not require prolonged bending with twisting.  The addendum to Dr. Bauer's report specifies that, in his opinion, while Plaintiff is not capable of constant repetitive trunk rotation in a sitting position, he is capable of frequent repetitive trunk rotation in both a sitting and standing position.  (AR-HART000990.)

While it is unclear to the Court whether Dr. Bauer was subsequently provided a copy of Plaintiff's August 2009 FCE and September 2009 records with Dr. Pinto, in connection with the appeal of Plaintiff's termination of benefits, such records were certainly not before Dr. Bauer when he conducted his IME record review in March 2009.

### iii.    Dr. Barron

The record also does not support Hartford's blanket statement that Dr. Barron found

Plaintiff capable of performing the duties of a dentist.  (AR-HART000010.)   In his August 17,

2009 IME conducted on Hartford's behalf, Dr. Barron concluded that Dr. Frerichs required

permanent restrictions.  (AR-HART001053.)  Yet he then contradicted himself, stating that

Plaintiff was capable of working in the "necessary dental operative position without any

limitations or restrictions."  (AR-HART001053-54.)  In addition, neither Dr. Barron's original

report of August 17, 2009 (AR-HART001045-54), nor his supplemental report of August 25,

2009 (AR-HART001056–57) indicate that he reviewed Plaintiff's August 2009 FCE, and both of

Dr. Barron's reports pre-date records of Plaintiff's September 2009 treatment with Dr. Pinto.

### iv.   Dr. Misukanis

While Hartford contends that Dr. Misukanis found no indication of significant cognitive

impairment, but found an exaggeration of symptoms, medical evidence from Dr. Misukanis

contradicts that assertion.  Following up on Dr. Berger's April 2008 assessment that Dr. Frerichs

was not able to be employed (AR-HART000391), Dr. Frerichs met with Dr. Misukanis in

December 2008.  (AR-HART000334-35.)  While Dr. Misukanis reported mild improvement,

which was "cause for encouragement," he opined that Dr. Frerichs "continues to demonstrate

minor cognitive difficulties and a significant psychological disturbance which, in my opinion,

would preclude a return to work as a dentist any time in the near future."  (Id.)

With respect to all of these physicians' opinions, the Court finds that Hartford either

ignored the record evidence, or misstated it in its decision to terminate Plaintiff's long-term

disability benefits and its denial of Plaintiff's appeal.  The Supreme Court has recognized that

treating physicians are not automatically entitled to special weight in disability determinations

under ERISA:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Here, Hartford has gone beyond analyzing and discrediting Plaintiff's evidence – it has misconstrued or misstated the opinion of one of Dr. Frerichs' treating physicians, and has further misconstrued or misstated the opinions of two of its own physicians.

While Hartford characterizes this as a mere "substantive disagreement" with the merits of Hartford's termination decision that does not rise to the level of a procedural irregularity (Def's Opp'n Mem. at 16 [Doc. No. 60]) , the Court disagrees. Case law regarding procedural irregularity, particularly the case law cited by Hartford in its Opposition Memorandum at 17 [Doc. No. 60], is not directly applicable to the issue before the Court.   It is not the case that Hartford failed to follow its own internal policies or procedures in reviewing Plaintiff's claim, nor does Plaintiff make such an argument.  This is not a case of disagreement about how the evidence should have been weighed – it is a case where Hartford misstated the record, including the opinions of its own physicians.   In doing so, the Court finds that the misstatements, compounded by a lack of clarity as to whether all the evidence was before Hartford, rise to a level of procedural irregularity.

Assuming that the Woo procedural irregularity test survives Glenn, see, e.g., Wrenn, 636 F.3d at 924, n. 6; Mohlke v. Metro. Life Ins. Co., No. 4: 10CV01995 JLH, 2012 WL 642554, at *2, n.7 (E.D. Ark. Feb. 28, 2012), the Court finds that Plaintiff has met the Woo test by showing "that: (1) ... a serious procedural irregularity existed, which (2) caused a serious breach of the

plan administrator's fiduciary duty...." Woo, 144 F.3d at 1160.   The procedural irregularity must also raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Buttram v. Cent. States Se. & Sw. Areas Health & Welfare Fund, 76 F.3d 896, 900 (8th Cir.1996).  Here, Hartford faults Plaintiff for a lack of medical data and objective findings to substantiate the severity of his symptoms and restrictions, yet in the next sentence of the appeal denial latter, claims, incorrectly, that the opinions of three doctors conclude that Plaintiff is capable of performing the duties of his occupation as a dentist. (See AR-HART000010.)   The Court finds that Hartford's determination demonstrates a breach of its fiduciary duty as the claims fiduciary.  As the Eighth Circuit has noted, an ERISA fiduciary is required to do more than comb the record for evidence in its favor and abandon its review upon discovering "more than a scintilla" of evidence in its favor.  Willcox v. Liberty Life Assur. Co. of Boston, 552 F.3d 693, 702 (8th Cir. 2009).  Here, Hartford did more than simply abandon its review and highlight its evidence – it misrepresented the evidence before it, including its own evidence.

Even if the Woo test no longer applies to procedural irregularities, Hartford's misstatements affect the overall reasonableness of its decision.  Hartford's determination in terminating Dr. Frerichs' benefits and in denying his appeal, were based on disregarding objective evidence and misconstruing and misstating physicians' opinions.  Hartford's selective reliance on certain opinions and reports, while misconstruing others, is particularly troubling given the inconsistencies in Hartford's determination, notably in the opinion of Dr. Barron. Basing its opinion on misconstrued and misstated evidence was unreasonable and constitutes an abuse of discretion.

### b.       Objective Findings and Medical Data

Further, as to Plaintiff's back pain and its effect on his ability "to sustain the dental

operative position as required to perform essential duties of [the] occupation," Hartford

contended in its denial of Plaintiff's appeal, that "the medical data and objective findings fail[ed]

to substantiate the severity of [Plaintiff's] claimed symptoms. . . ."  (AR-HART000010.)

Hartford concluded that Plaintiff's claimed symptoms were based "mostly, if not entirely," on

Plaintiff's self-reports.  (Id.)  The record indicates otherwise, as reflected in numerous "objective

findings," including Plaintiff's MRI results (see AR-HART000652; HART000760;

HART001325),  back surgeries (see AR-HART000654; HART000660; HART000500;

HART000471); and discograms (see AR-HART000365-66).

In addition, the record upon which Hartford based its denial of benefits does not appear to

be entirely complete.  In Hartford's April 7, 2009 denial of benefits letter, records relating to

Plaintiff's October 2007 OTE are not listed among the records included in Hartford's claim

review.  (AR-HART001232-33.)  Even if the OTE record was included in its review, but not

listed, Hartford does not address it in the letter.

Plaintiff identifies as a procedural irregularity that two pages of the September 22, 2009

medical records were missing from the Administrative Record.   It appears that the September

22, 2009 records from Dr. Pinto were originally part of the Administrative Record, but, for some

reason, were not produced as part of the Administrative Record in this litigation.   It appears that

the documents were missing due to simple inadvertence.  Defendant agrees that they were part of

the Administrative Record and should be considered as such.  They are therefore considered by

the Court.  The Court has noted in this opinion the extent to which these particular records may

not have been addressed or considered in various physicians' opinions or Hartford's conclusions. In this respect, whether such evidence was considered or not is part of the Court's analysis of the "quantity and quality" of evidence supporting the reasonableness of Hartford's decision. See Clapp, 262 F.3d at 828 (stating that courts must evaluate the quantity and the quality of the evidence under the abuse of discretion review for reasonableness). It may be the case that the September 2009 medical records were before Hartford in connection with Plaintiff's appeal, but the fact that Hartford's November 9, 2009 denial letter fails to address these medical records is of concern to the Court.[4]

Plaintiff also identifies as a procedural irregularity Hartford's failure to arrange for an FCE on two occasions when Plaintiff's treating physicians, Drs. Lynn and Pinto, recommended an FCE. The Court does not view this as a procedural irregularity. The Eighth Circuit has found no procedural irregularity where a claim administrator fails to order an IME or FCE, but instead conducts independent expert reviews of the claimant's medical record and contacts treating physicians. See, e.g., Heaser v. Toro Co., 247 F.3d 826, 833 (8th Cir. 2001) (finding no procedural irregularity where claim administrator failed to order an IME, but reviewed the claimant's medical records, contacted one of the treating physicians and ordered a medical record review); abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir.

---

[4] In the denial of appeal letter, Hartford refers to a September 25, 2009 letter from Dr. Frerichs, in which Frerichs noted an appointment with Dr. Pinto to review the results of his FCE, as well as other upcoming appointments. (AR-HART000009.) Hartford indicates that Dr. Frerichs "did not provide any additional information from any of these providers." (Id.) However, Plaintiff contends that these records "were among medical records produced by Hartford to Dr. Frerichs' [counsel ] in December 2009, shortly after Hartford denied Frerichs' appeal, although missing from the Administrative Record in this litigation." (Pl's Mem. Supp. Mot. Summ. J. at 42-43 [Doc. No. 53].) It appears that Hartford may have received the letters after it denied Plaintiff's appeal.

2011); see also Eastman Kodak v. Prudential Ins. Co. of Am., No. 06-CV-4123 (MJD/RLE), 2008 WL 250597, *14 (D. Minn. Jan. 29, 2008) (finding no procedural irregularity where the insurer failed to obtain an IME or FCE but had three independent experts review the claimant's medical record and contact two of the claimant's treating physicians). While Plaintiff cites to Payzant, 402 F. Supp.2d at 1062, in support of his position regarding the failure of Hartford to arrange an FCE, that decision is consistent with the authority noted above. In Payzant, this Court found the failure to obtain either an FCE or an IME was a procedural irregularity where the insurer also failed to speak with the claimant's primary physician about why he recommended an FCE. 402 F. Supp.2d at 1062. Here, the evidence indicates that Hartford made contact with several of Plaintiff's physicians, including Dr. Pinto. In addition, while Plaintiff arranged for his own OTE and FCE, the records from those examinations were considered by Hartford.

### 2.      "Essential Duties of [Dentistry]"

In determining that Plaintiff was not "prevented from performing one or more of the Essential Duties of [his] Occupation," as that occupation is recognized in the general workplace. (AR-HART000918; HART000920), Hartford contends that substantial evidence supports its interpretation of the essential duties of dentistry. The Court disagrees. The record indicates that Hartford applied the wrong standard in several instances.

In its termination of Plaintiff's benefits, Hartford indicated that in order to qualify for disability benefits, a claimant must demonstrate an inability to perform the Essential Duties of [His or Her] Occupation. (AR-HART001233.) Again, as stated in the Policy and quoted in the termination of benefits letter, "Your Occupation" means "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a

specific employer or at a specific location." (AR-HART000921.)   Yet Hartford requested

information from Dr. Frerichs' employer as to the physical requirements of his job, which it

quoted in the termination of benefits letter. (AR-HART001233.)  That job-specific information

noted that Plaintiff's specific job required occasional reaching below waist level and constant

reaching at waist level. (Id.)   Moreover, the information from his employer indicated that 95%

of Dr. Frerichs' day was spent on "clinical dentistry." (AR-HART000707.)

      Elsewhere in its termination of benefits letter, Hartford referred to an Occupational

Analysis performed by a "Rehabilitation Case Manager from The Hartford," who indicated that,

in the general workplace, "a dentist is considered a light duty occupation." (AR-HART001236.)

The analysis as referenced in the letter, however, offered no details as to the essential elements of

a dentist's occupation, other than sitting: "Sitting varies from day to day but on average, sitting is

required 4-8 hours per day total, pending meetings, procedures and paperwork.  Most full time

dentists work between 35-40 hours per week and experienced dentists often work fewer hours."

(Id.)   The Court finds that Hartford's analysis of the "Essential Duties of Your Occupation" in its

termination of benefits letter either applied the wrong standard (i.e., that of Dr. Frerichs' specific

job) or was woefully inadequate (i.e., the in-house opinion that dentistry is a light duty

occupation that requires sitting).

      In his appeal, Plaintiff proffered DOT information setting forth the abilities required of a

dentist, as well as dentists' work activities. (AR-HART0002740311.)  Among the required

abilities are: (1) "extent flexibility," which is "[t]he ability to bend, stretch, twist, or reach out

with the body, arms and/or legs; (2) "trunk strength," which is "[t]he ability to use one's

abdominal and lower back muscles to support part of the body repeatedly or continuously over

time without 'giving out' or fatiguing; and (3) "dynamic flexibility," which is "[t]he ability to quickly and repeatedly bend, stretch, twist or reach out with the body, arms and/or legs."  (AR-HART000302-04.)

In connection with Plaintiff's appeal, Hartford hired Rehabilitation and Re-Employment, Inc. to conduct a labor market survey.  Included in their charge, Hartford's researchers were asked to determine the percentage of time a dentist in the Twin Cities performs operative procedures.  (AR-HART001018.)  The researchers found that in the three surveyed Twin Cities' dental practices, dentists typically spent 75% percent of their time performing "restorative procedures such as the examinations of the teeth and gums, root canals, cavity fillings, tooth shaping for crowns, crown fitting and placement, bridge and denture assessment and follow-up exams."  (AR-HART001019.)   The procedures identified by Hartford's researchers appear to be precluded by Dr. Pinto's conclusion that Dr. Frerichs could perform "Non operative dentistry. Short duration procedures only" (CF001556, Ex. A to Johnson Aff.) and that his August 2009 FCE showed significant restrictions that interfered with Dr. Frerichs' "ability to work at his regular job as a dentist (operative dentistry)."  (CF001555, Ex. A to Johnson Aff.)

In the penultimate analysis paragraph in the denial of Dr. Frerichs' appeal, Hartford concluded that Frerichs is able to perform light duty work – not that he is able to perform the essential duties of his occupation, as required by the Policy language.  Instead, Hartford concluded:

> While it is appreciated an [sic] understood that you may likely have some restrictions on your activity, the weight of the medical information supports your ability to perform at least light duty work and your occupation as understood in the national economy is considered light duty as indicated by the information provided by the Employer and defined by the Dictionary of Occupational Titles (DOT) as well as the Social Security Administration.

(AR-HART000011) (emphasis added).  Rather than address the "essential duties" of Plaintiff's occupation, Hartford instead concluded that Plaintiff was capable of doing "light duty" work. (AR-HART000005; HART000011.)  The Policy, however, does not contemplate such a broad interpretation.  The Policy defines an "essential duty" as one that: "(1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) can not be reasonably omitted or changed."  (AR-HART000918.)

Similarly, in its denial of Plaintiff's appeal, Hartford relied upon the opinion of neuropsychologist Susan McPherson, but Hartford did not ask McPherson whether, in her opinion, Dr. Frerichs retained the functional capacity to perform the essential duties of his occupation as a dentist.  (See AR-HART000352.)  Instead, Hartford asked whether he had the functional capacity "to perform in an occupation."  (Id.) (emphasis added).   Again, the Policy does not provide for long-term disability benefits only when a claimant is prevented from performing "in an occupation" – it provides for benefits when a claimant is "prevented from performing one or more of the Essential Duties of [his] Occupation," as that occupation is recognized in the general workplace. (AR-HART000918; HART000920.)

For all of these reasons, the Court finds that substantial evidence does not support Hartford's  interpretation of the essential duties of dentistry.  Moreover, in light of the Policy language, the Court finds that Hartford's determinations as to those essential duties, do not withstand scrutiny for reasonableness.

### 3.  Surveillance Video, Changed Circumstances and Social Security Determination

The parties advance various arguments regarding the surveillance video, changed circumstances and the Social Security Administration's determination of disability.   The Court

addresses arguments related to these issues in brief, as it does not find them particularly

persuasive for either party.

### a.      Surveillance Video and Changed Circumstances

It was appropriate for Hartford to re-evaluate Plaintiff's long-term disability claim in light

of anonymous information that it received concerning Plaintiff's abilities, which might constitute

changed circumstances.  To its credit, as part of its re-evaluation, Hartford obtained some IME

evidence as well.   As to the issue of changed circumstances, the Eighth Circuit has noted that

where an insurer has terminated benefits that it previously awarded, courts may take this factor

into account, absent a significant change in circumstances:

> We are not suggesting that paying benefits operates forever as an estoppel so that
> an insurer can never change its mind; but unless information available to an
> insurer alters in some significant way, the previous payment of benefits is a
> circumstance that must weigh against the propriety of an insurer's decision to
> discontinue those payments.

McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002).   Here, while there was

some indication of cause for encouragement with respect to Plaintiff's depression, or possible

improvement in his back pain, the FCE and opinions of Plaintiff's physicians, and certain of

Defendant's physicians' opinions, do not support a change in the previous determination that

Plaintiff was incapable of performing the essential duties of a dentist, specifically operative

dentistry.

Hartford also conducted video surveillance of Dr. Frerichs as he took a two-day driving

trip.  The Eighth Circuit has held that "[t]he use of video surveillance to observe a benefits

claimant's condition is reasonable."  Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1052 (8th Cir.

2011).  In addition, "video evidence need not establish conclusively that a benefits claimant can

41

work full time. Rather, video evidence provides another form of objective evidence upon which an ERISA plan administrator may base its claims determinations." Id.   In Green, the Eighth Circuit found that the insurer's observations of the claimant over a two-day period "functioning with little to no apparent difficulty" was evidence supporting the insurer's denial of the benefits claim.  Id.   In another Eighth Circuit decision, however, the court affirmed the trial court's reinstatement of disability benefits, despite surveillance video evidence demonstrating the claimant driving his car, eating lunch at a restaurant, carrying light objects, sitting and reading, and stretching and doing light aerobic exercise at the gym for about forty-five minutes.  Morgan v. Unum Life Ins. Co. of Am., 346 F.3d 1173, 1178 (8th Cir. 2003).  In its decision in Green, the Eighth Circuit distinguished Morgan, noting that the activities in which the claimant engaged in Morgan were already known to the insurer, whereas in Green's case, the surveillance showed Green engaging in activities that his physicians did not believe he could perform.  Green, 646 F.3d at 1052, n.5.

Here, the video surveillance shows Dr. Frerichs behind the wheel of a car, and when not in the car, he is observed walking, carrying a small table, carrying a suitcase, bending into the car, closing the hatch of the car, pumping gas and squatting to check the pressure of his tires. While Dr. Frerichs indicated when he was interviewed by Hartford's investigator that he could drive for no more than three hours a day, with a break for stretching, he later qualified his response, after having seen the video surveillance.  (AR-HART001161; HART001199.)  Dr. Frerichs indicated that he felt he had little choice to take the trip to exchange vehicles with his son, but took extra pain medication and frequent breaks.  (AR-HART001461-71.)

The Court finds the video surveillance evidence is of limited value.  Evidence in the

record shows that Plaintiff was not prohibited from carrying objects of the approximate weight of

a small table or suitcase.  (See AR-HART001159) (indicating that Plaintiff could lift and carry

items of about 20 pounds a distance of approximately 30 yards).  There is evidence showing that

Plaintiff was not prohibited from squatting or reaching overhead.  (AR-HART001159-60.)   The

Court therefore views this evidence as more like that in Morgan.  Other than the total length of

time spent in the car, or behind the wheel, for which Plaintiff offered a subsequent explanation,

the activities in which Plaintiff engages on the video are not completely contradicted by evidence

in the record.

Furthermore, the Court notes that the interpretation of this video is inherently subjective.

From the Court's review of the video surveillance, Plaintiff can be observed on several

occasions, rubbing his back, or reaching for his back, as in response to pain or discomfort.  He is

observed getting out of the car on numerous occasions, whether for gas or food, consistent with

Frerichs' explanation that he can drive for longer periods of time, but only with breaks and

increased pain medication.   Moreover, despite Hartford's characterization of Dr. Frerichs' ease

of movement, at times, when Plaintiff is observed on a break, his gait appears stiff, or certainly

not as fluid as that of a person without a history of back pain.   The video surveillance also shows

Dr. Frerichs engaged in activity that is apparently outside the norm of his daily activities  – this

was a one-off trip, undertaken by necessity.   See, e.g., Holubek v. Unum Life Ins. Co. of Am.,

No. 06-C-121-S, 2006 WL 2434991, *11, n.4 (W.D. Wisc. Aug. 22, 2006) (finding video

surveillance of little value because it failed to demonstrate that plaintiff could sustain such a level

of activity on a continuous basis);  Grosz-Salomon v. Paul Revere Life Ins. Co., CV-98-7020

DDP(RNBX), 1999 WL 33244979, *6  (C.D. Cal. Feb. 4, 1999) (noting that the video

surveillance did not show the context of the plaintiff's life).

More importantly, the video surveillance does not show Dr. Frerichs engaged in the activity for which he claims long-term disability benefits – the inability to perform the essential duties of a dentist. See, e.g., Osburn v. Auburn Foundry, Inc., 293 F. Supp.2d 863, 869 (N.D. Ind. 2003) (finding that surveillance evidence fell far short of demonstrating that the plaintiff was capable of sustaining a job). The Policy at issue here is fairly narrow, defining a disability as the inability to perform the essential duties of one's occupation. The surveillance does nothing to illuminate the extent to which Plaintiff can assume the dental operative position, or perform any of the essential duties of a dentist. In addition, the surveillance sheds no light on the extent to which Plaintiff's depression impacts his ability to perform the essential duties of dentistry. In sum, the Court finds that the surveillance video does not substantially support Hartford's conclusion that Plaintiff is no longer disabled.

### b.    Favorable Social Security Disability Determination

Plaintiff cites to his award of Social Security Disability benefits as further evidence in his favor, arguing that Hartford should have accorded greater deference to the agency's determination. The Court disagrees.

Plaintiff's March 11, 2009 award of Social Security Disability benefits was apparently not considered or addressed in Hartford's April 7, 2009 termination of benefits letter. (See AR-HART001232-33.) Hartford did address it, however, in its November 9, 2009 letter denying Plaintiff's appeal. (AR-HART000011.) Hartford noted that different definitions of disability apply and different criteria for awarding benefits apply to the respective proceedings. (Id.) This is correct, as an ERISA plan is not bound by a Social Security Administration decision finding

disability – even when the respective definitions of "disabled" are similar.  Rutledge v. Liberty

Life Assur. Co. of Boston, 481 F.3d 655, 660-61 (8th Cir. 2007) (citing Farfalla v. Mutual of

Omaha Ins. Co., 324 F.3d 971, 975 (8th Cir. 2003)).  In addition, Hartford identified evidence

that was not before the ALJ as another ground for reaching a different determination.  (Id.)

   This is not a case in which the plan administrator failed to acknowledge the award of

Social Security disability benefits or explain why it accorded little value to the agency's decision.

See Chronister v. Unum Life Ins. Co. of Am., 563 F.3d 773, 776 (8th Cir. 2009) (claims

administrator's failure to follow own policy of granting deference to determination of Social

Security Administration indicated an abuse of discretion).  While the Court observes that

Plaintiff met the Social Security Administration's definition of disability, requiring him to

establish that he was unable to engage in any substantial gainful activity (see AR-HART000381),

the Court finds that Hartford properly acknowledged and addressed the agency's ruling.

### 4.  Conflict of Interest

   Plaintiff argues that Hartford, in its role as plan administrator and plan insurer, has an

inherent conflict of interest.  Specifically, Plaintiff points to the opinion of Dr. Jay, and argues

that Dr. Jay has provided similar vocational assessments in 132 out of 180 claims.  (Def's Supp'l

Interrog. Responses, Interrog. No. 4, Ex. C to Aff. of Todd M. Johnson [Doc. No. 54-3.)

Plaintiff also offers UDC marketing materials touting its approach to providing functional

capacity assessments.   (UDC Document, Ex. D to Johnson Aff. [Doc. No. 54-4].)   Courts in

other jurisdictions have considered the same argument advanced by Plaintiff here, with respect to

an opinion offered by Dr. Jay on behalf of Hartford.  See, e.g., Fortune v. Group Long Term

Disability Plan for Employees of Keyspan Corp., 637 F. Supp.2d 132, 143 (E.D.N.Y. 2009);

45

Meylor v. Hartford Life Ins. Co., 444 F. Supp.2d 963, 978 (N.D. Iowa 2006).  In Fortune, the

court acknowledged the appearance of a conflict of interest:

> The Court recognizes that Dr. Jay . . . [was] referred to Hartford by UDC and that
> UDC may derive a considerable percentage of its revenue from Hartford.  The
> Court also appreciates that, because of this relationship with Hartford, doctors
> referred by UDC may have some financial incentive to deny a participant's claim
> for long-term disability benefits.

637 F. Supp.2d at 143.   However, in Fortune, the Court concluded that the plaintiff offered no

convincing medical reason why the medical opinions should be disregarded or de-valued.  Id.   In

Meylor, the court observed that while the plaintiff alleged an apparent financial conflict based on

Hartford's role as both insurer and administrator, he "produced no evidence that this dual role

influenced Hartford's decision to terminate Meylor's long-term disability benefits."  444 F.

Supp.2d at 978.  Moreover, in rejecting Meylor's argument of a conflict of interest, the court

noted, "Hartford's consideration of extensive medical evidence in making its decision to

terminate Meylor's long-term disability benefits as well as Hartford's decision to obtain reviews

by Dr. Johnston, Dr. Blair and Dr. Jay before making its decision dissipate the allegations of a

conflict of interest."  Id.

       First, the evidence submitted by Plaintiff in support of its conflict of interest argument

was not part of the administrative record.   Review of the administrator's decision is limited to

the administrative record that was before the plan administrator at the time that the final benefits

decision was made.  Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 642 (8th Cir. 1997).

However, in Glenn and Chronister, both the Supreme Court and the Eighth Circuit noted that an

administrator's history or pattern of denial of claims could be considered as a tiebreaking factor

in evaluating a conflict of interest, in some circumstances.  In these decisions, the courts did not

address whether evidence of a  history or pattern of denials could only be considered if it was

part of the administrative record.  In <u>Glenn</u>, the Court stated:

> The conflict of interest at issue here, for example, should prove more important
> (perhaps of great importance) where circumstances suggest a higher likelihood
> that it affected the benefits decision, including, but not limited to, cases where an
> insurance company administrator has a history of biased claims administration.
> <u>See</u> John H. Langbein, Essay, <u>Trust Law as Regulatory Law: The Unum/Provident
> Scandal and Judicial Review of Benefit Denials Under ERISA</u>, 101 Nw. U.L.Rev.
> 1315, 1317-21 (Spring 2007) (detailing such a history for one large insurer). It
> should prove less important (perhaps to the vanishing point) where the
> administrator has taken active steps to reduce potential bias and to promote
> accuracy, for example, by walling off claims administrators from those interested
> in firm finances, or by imposing management checks that penalize inaccurate
> decisionmaking irrespective of whom the inaccuracy benefits. <u>See</u> Herzel &
> Colling, <u>The Chinese Wall and Conflict of Interest in Banks</u>, 34 Bus. Law 73, 114
> (1978) (recommending interdepartmental information walls to reduce bank
> conflicts).

<u>Glenn</u>, 554 U.S. at 117-118.  In <u>Chronister</u>, the Eighth Circuit cited decisions, including <u>Glenn</u>,

in which courts considering a conflict of interest argument had noted a particular insurer's

history of apparently arbitrary benefit denials:

> Here, there are several factors that point to an abuse of discretion in Unum's
> handling of Chronister's claim.  First is Unum's financial conflict of interest,
> which during the time of Chronister's initial application for benefits led to a
> "disturbing pattern of erroneous and arbitrary benefit denials, bad faith contract
> misinterpretations, and other unscrupulous tactics." <u>Radford Trust v. First Unum
> Life Ins. Co.</u>, 321 F. Supp.2d 226, 247 (D. Mass.2004).   The Supreme Court itself
> commented on Unum's "history of biased claims administration." <u>Glenn</u>, 128 S.
> Ct. at 2351.

563 F.3d at 776 (internal citation omitted).

Here, even assuming that the Court may consider the evidence offered by Dr. Frerichs in

support of his conflict argument, the Court finds that it does not sufficiently show that a palpable

conflict of interest influenced Hartford's decision. Moreover, as in <u>Meylor</u>, the record shows that, in general, Hartford did consider Plaintiff's medical evidence – although, as noted herein, it significantly misstated certain opinions – and it obtained reviews by Drs. Barron, Bauer and McPherson. Particularly as conflict of interest evidence is viewed under <u>Glenn</u> as "tiebreaker" evidence, the Court finds that the evidence offered by Plaintiff does not sufficiently demonstrate a conflict of interest.

## III.  CONCLUSION

The Court concludes, under an abuse of discretion standard of review, that Defendant's termination of Frerichs' long-term disability benefits and denial of his appeal were not reasonable. Hartford's decisions were based, in large measure, on evidence that either supported Plaintiff's claim, or misstated opinions in the record. Objective evidence in the record supports Dr. Frerichs' claim of disability. Specifically, the record indicates that Plaintiff met the Policy definition for long-term disability in that he was prevented from performing "one or more of the essential duties of his occupation." Plaintiff submits that "operative dentistry" is an essential duty of his occupation. The record provides ample evidence that whether this is called "traditional dentistry," "clinical dentistry," "restorative dentistry" or "operative dentistry," it refers to the dentistry tasks that require prolonged bending and twisting and repetitive bending from the waist as a dentist works on a patient's teeth. While Hartford takes issue with the particular terminology, even certain of Hartford's own physicians concluded that Plaintiff could not perform certain of these duties. Moreover, Hartford's own evidence of the essential duties of dentistry included evidence that dentists spend over 75% of their time performing restorative procedures. In addition, in both in its termination decision and on appeal, Hartford failed to apply the proper standard to the

48

determination of "disability" – the standard set forth in its own Policy – by considering overly-narrow job-specific definitions of Plaintiff's occupation provided by his last employer, as well as overly-broad definitions of disability such as a general ability to work.

In addition, the record reflects insufficient evidence of a significant change in circumstances justifying Hartford's termination of benefits, when Hartford had previously awarded benefits to Plaintiff. The Court holds that, based on the record that was before Defendant, Frerichs was entitled to long-term disability benefits. Pursuant to ERISA, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Hartford is directed to pay all past benefits and reinstitute disability payments.

The Court "in its discretion may allow a reasonable attorney's fees and costs of action to either party." 29 U.S.C. § 1132(g). There is no presumption that a prevailing party is entitled to attorney's fees. See Martin v. Arkansas Blue Cross and Blue Shield, 299 F.3d 966, 971–72 (8th Cir. 2002). That being said, the Eighth Circuit has previously emphasized the role of ERISA's remedial nature in determining whether to award fees, stating:

> ERISA is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans. A district court considering a motion for attorney's fees under ERISA should therefore apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts.

Starr v. Metro Systems, Inc., 461 F.3d 1036, 1040 (8th Cir. 2006) (citations omitted).

In deciding whether to award attorney's fees in an ERISA action, the court should consider the following five factors:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the

opposing parties to satisfy an award of attorneys' fees; (3) whether an award of
attorneys' fees against the opposing parties could deter other persons acting under
similar circumstances; (4) whether the parties requesting attorneys' fees sought to
benefit all participants and beneficiaries of an ERISA plan or to resolve a
significant legal question regarding ERISA itself; and (5) the relative merits of the
parties' positions.

Lawrence v. Westerhaus, 749 F.2d 494, 495 (8th Cir. 1984).

With respect to these factors, the Court finds, in its discretion, that Frerichs is entitled to

an award of attorney's fees and costs.  While the Court makes no finding of bad faith on the part

of Hartford, it could have exercised greater care in reviewing the record and applying the literal

terms of its Policy to its review of Plaintiff's claim.  The remaining factors weigh in favor of an

award.  Frerichs shall submit an affidavit documenting his reasonable fees and costs, to which

Hartford may respond, as set forth below.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Defendant's Motion for Summary Judgment [Doc. No. 47] is **DENIED**;

2.       Plaintiff's Motion for Summary Judgment [Doc. No. 52] is **GRANTED**;

3.      Plaintiff shall submit within ten days of the date of this Order an affidavit

        documenting his reasonable fees and costs incurred in this action; and

4.      Defendant may submit a responsive affidavit ten days thereafter.


Dated: June 21, 2012                              s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge

50